UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL HENRY,
        Plaintiff,

    v.

ABBVIE, INC.,

        Defendant.

No. 23 CV 16830

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Daniel Henry applied to work at defendant AbbVie, Inc. as a technician at their North Chicago, Illinois, facility through a staffing agency. He was hired as a contracted product technician. When he started, he was required to complete a physical examination. During the examination, Henry says the healthcare provider asked him about his family medical history of certain conditions. Henry was also asked to fill out a questionnaire with questions about his and his partner's reproductive medical history. Henry sued AbbVie for violations of Illinois's Genetic Information Privacy Act, which prohibits employers from requesting genetic information of an individual or their family members as part of a preemployment application. AbbVie moves for summary judgment. The motion is granted.

## I.    Legal Standards

A motion for summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A defendant is entitled to summary judgment if the plaintiff "cannot present sufficient evidence to create a

dispute of material fact regarding any essential element of her legal claims on which she bears the burden of proof." *Burton v. Bd. of Regents*, 851 F.3d 690, 694 (7th Cir. 2017). I view all the facts and draw reasonable inferences in favor of the non-moving party to determine whether summary judgment is appropriate. *See Uebelacker v. Rock Energy Coop.*, 54 F.4th 1008, 1010 (7th Cir. 2022).

## II.     Facts

Daniel Henry applied for a contract worker position at a staffing agency that contracts with AbbVie, Inc. [90] ¶ 5.[1] He was assigned to work as a product technician at AbbVie's AP16 Facility in North Chicago, Illinois. [90] ¶ 6. Before he started working, Henry received an email from the staffing agency with "first day reporting instructions," including that his point-of-contact at AbbVie was Ericka Harrington. [90] ¶ 7; [60-1] at 5; [61-1] at 5 (30:1–16).

For each worker (whether a contractor or employee) who began working at AbbVie, an AbbVie professional determined whether the worker needed to complete all or part of what AbbVie called a "medical surveillance," which could include

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. The facts are largely taken from the plaintiff's response to defendant's Local Rule 56.1 statement of facts, [90], and defendant's response to plaintiff's statement of additional facts, [102], where both the asserted fact and the opposing party's response are set forth in one document. Any asserted fact that is not controverted by reference to specific, admissible evidence is deemed admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). I disregard legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). To the extent that disputed facts are relevant and the parties rely on admissible evidence, I include both sides' version, understanding that the nonmovant is entitled to favorable inferences. This opinion cites sealed portions of the record. The cited materials were relevant to the court's decisionmaking and the public right to access outweighs any parties' general interest in confidentiality. The cited materials are unsealed.

questionnaires, blood work, and a brief physical exam. [90] ¶ 8.[2] The purpose of a medical surveillance, according to AbbVie, was to prevent a worker with a baseline disease from being exposed to any materials, chemicals, or equipment that may cause them harm, and also to determine whether a worker could perform the essential functions of the assigned position. [90] ¶ 11. AbbVie's standard operating procedures provided guidance on medical surveillances. [90] ¶ 10. Whether to request a medical surveillance, and what parts need to be completed, was based on a risk assessment of the role, the work area, and the potentially harmful exposures to the new hire. [90] ¶¶ 8–9; [102] ¶ 59. Harrington was responsible for leading onboarding orientation for new-hire employees and contractors, including scheduling the medical surveillance within the first two weeks of a new hire's employment. [91-6] ¶¶ 1–2; [102] ¶ 53.[3]

---

[2] Henry objects to the foundation of the evidence for this (and many other) facts: the declaration of AbbVie Global Occupational Health Nurse Manager Romy Pinkovsky. He also objects to the exhibits attached to Pinkovsky's declaration as unauthenticated. In response, AbbVie submitted a declaration from another Global Occupational Health Nurse Manager, Kim Dellutri, who was responsible for developing and updating medical surveillance procedures and technical standards. [101-1] ¶ 1. Dellutri reviewed Pinkovsky's declaration and found it accurately described the purpose, development, use, and storage of the standard operating procedures for medical surveillances. [101-1] ¶ 3. Dellutri also looked at the attached exhibits and averred, based on her familiarity with them because of her job responsibilities, that they were true, accurate, and complete copies of the standard operating procedures that governed Henry's medical surveillance. [101-1] ¶ 13. AbbVie also submitted a second declaration from Pinkovsky. [101-2]. Pinkovsky said that as part of her role, she was required to review, understand, revise, and update the standard operating procedures that apply to medical surveillances. [101-2] ¶ 3. She had access to the standard operating procedures in place at the time of Henry's medical surveillance and knew that copies of the procedures were regularly maintained in AbbVie's document management system. [101-2] ¶ 3. Because Pinkovsky has personal knowledge of the standard operating procedures, and because Dellutri separately provides a basis of knowledge for the exhibits, the exhibits are authenticated and admissible. I also find that Pinkovsky is qualified to testify about AbbVie's standard operating procedures and the procedures that were in place when Henry was working as a product technician at AbbVie.

[3] AbbVie objects to former AbbVie Training Specialist and Senior Training Coordinator Erika Harrington's declaration because it says she had no foundation to testify and does not testify

AbbVie used third-party healthcare providers, like Premise Health, to conduct medical surveillances. [90] ¶ 16. AbbVie did not direct healthcare providers to ask actual or potential workers to disclose their family medical history during the medical surveillance or any part of the interview or hiring process. [90] ¶ 12. In its general medical questionnaire that was part of the surveillance, AbbVie instructed workers to "not provide any genetic information, including family medical history" when "responding to any AbbVie requests for medical information." [90] ¶ 13; [61-1] at 139.

AbbVie says it did not condition an employee's employment or contractor's work status on a request for or the disclosure of their family medical history. [60-1] at 10 (¶ 11), 21 (¶ 8); [90] ¶ 14. Nurse Manager Romi Pinkovsky says that a worker could have declined to participate in a medical surveillance (or parts of it) and still maintained his work status or employment if he and the third-party health care provider signed a medical surveillance declination form. [60-1] at 10 (¶ 9); [90] ¶ 15. Harrington says, on the other hand, that had Henry not completed his medical surveillance, AbbVie would have rejected his assignment. [91-6] ¶ 4; [102] ¶¶ 49, 51.

---

about what occurred during Henry's medical surveillance, and because she has failed to establish a foundation to testify about AbbVie's policies related to a worker declining to complete a medical surveillance. [100] at 15. Harrington did not make any claims about AbbVie's policies in general. Instead, she averred that she was in charge of Henry's onboarding, including personally scheduling his medical surveillance. [91-6] ¶¶ 1, 3. She also said that if Henry had not completed his medical surveillance, AbbVie would have rejected his assignment, and that Henry was not given the option to decline completing his medical surveillance. [91-6] ¶¶ 4–5. Her testimony is supported by AbbVie's standard operating procedures, which says that the "minimum requirements" for workers include a medical surveillance, where an employee "shall complete" certain sections of the medical questionnaire, undergo a physical exam, and have certain testing completed. [61-1] at 71, 73–74 (§§ 1.1–1.2, 3.2). Harrington has a sufficient foundation to testify about whether Henry was required to undergo a medical surveillance and whether he was given an option to decline.

She says that Henry was not given the option to decline to complete the medical surveillance. [91-6] ¶ 5; [102] ¶¶ 49, 54.

Henry underwent a medical surveillance conducted by Premise Health nurses at an AbbVie facility. [90] ¶ 19. AbbVie says the medical surveillance was "governed by the relevant AbbVie product technician" standard operating procedures. [90] ¶ 20. Henry's medical surveillance included filling out portions of a questionnaire; taking hearing, vision, and spirometry tests; submitting to a blood draw; and undergoing a physical examination. [90] ¶ 21. The questionnaire Henry filled out included the provision warning him not to provide "any genetic information, including family medical history, the results of genetic tests, information about genetic services, or genetic information of a fetus or embryo." [61-1] at 25–26 (148:22–149:21), 139. Section U of the form did, however, ask about children with birth defects, stillbirths, and premature birth. [90] ¶ 27; [61-1] at 145. Henry says he was asked to "fill out the questionnaire as you go through your exam." [91-4] at 15 (110:15–25). He did not answer any questions in Section U of the questionnaire. [90] ¶ 28.

During the physical exam, Henry says that a nurse asked him questions about his family's medical history of cancer, hepatitis, and heart issues. [90] ¶¶ 24, 30; [102] ¶ 56; [91-4] at 16–17 (116:22–117:5), 18 (118:4–8), 19 (122:2–7). That nurse says she "disagrees" that she asked Henry about his family history of those conditions. [60-1] at 26 (¶ 5). There are no written records indicating the questions were asked or answered. [61-1] at 163–97. AbbVie says it did not ask, request, or direct either nurse to solicit family medical history from Henry, and the standard operating procedures

for the product technician position do not instruct Premise Health to request family medical history. [90] ¶¶ 31–32.

Despite not answering the questions in Section U of the questionnaire, Henry returned to work at AbbVie's AP16 facility as a product technician. [61-1] at 20 (115:5–8). Nothing changed in his work assignment or contractor status after the medical surveillance. [60-1] at 21 (¶ 5); [61-1] at 23 (125:5–12).[4] Henry remained a contractor at AbbVie until he was terminated four months later for unrelated reasons. [90] ¶¶ 38, 42.

An AbbVie human resources associate director (who was a human resources manager at the time Henry worked at AbbVie) says that a worker's status at AbbVie was never conditioned upon a request for or disclosure of family medical history, or the family medical history itself, during the medical surveillance or any part of the interview or onboarding process. [60-1] at 21 (¶ 8). Harrington says that AbbVie required new hires to complete their medical surveillance within two weeks of their start date, and that AbbVie would have rejected Henry's assignment had he not completed his medical surveillance in that two-week time frame. [91-6] ¶¶ 4–5.

## III. Analysis

The Genetic Information Privacy Act regulates the use, disclosure, and acquisition of genetic information. 410 ILCS 513/5; *see also Bridges v. Blackstone,*

---

[4] Henry disputes this fact, but his cited evidence does not contradict the asserted fact.

*Inc.*, 66 F.4th 687, 688 (7th Cir. 2023).[5] GIPA incorporates protections from the federal Genetic Information Nondiscrimination Act. *See* 410 ILCS 513/25(a) ("An employer … shall treat genetic testing and genetic information in such a manner that is consistent with the requirements of federal law, including but not limited to the Genetic Information Nondiscrimination Act of 2008") *and* 42 U.S.C. § 2000ff-1. Under Section 25(c)(1) of GIPA, an employer may not "solicit, request, [or] require … genetic information of a person or a family member of the person … as a condition of employment [or] preemployment application." 410 ILCS 513/25(c)(1). Genetic information includes family medical history. *Henry v. AbbVie, Inc.*, No. 23 CV 16830, 2024 WL 4278070, at *5–6 (N.D. Ill. Sept. 24, 2024). Section 40 provides a private right of action for "any person aggrieved" by a violation of the Act. 410 ILCS 513/40(a).

AbbVie argues that Henry has not shown that it violated GIPA, first, because Premise Health, not AbbVie, requested Henry's genetic information, and AbbVie never directed Premise Health to do so. Second, AbbVie says that even if AbbVie did request genetic information, any disclosure was inadvertent because AbbVie's medical surveillance questionnaire contained an instruction that genetic information should not be shared. And third, AbbVie says that even if it asked for genetic information, it did not condition Henry's work status or assignment on whether he provided the information or the information itself.

---

[5] I have subject-matter jurisdiction under the Class Action Fairness Act of 2005. 28 U.S.C. § 1332(d)(2). *Henry v. AbbVie, Inc.*, No. 23 CV 16830, 2024 WL 4278070, at *2 (N.D. Ill. Sept. 24, 2024).

## A.     Request for Genetic Information

AbbVie used a third-party, Premise Health, to conduct Henry's medical surveillance. It argues that it did not direct or ask Premise Health to request genetic information from Henry during the medical surveillance, and so it did not request genetic information from Henry. It denies it has an affirmative duty to tell Premise Health not to elicit genetic information during physical exams.

Both GIPA and GINA prohibit employers from requesting genetic information, including family medical history. 410 ILCS 513/25(c)(1); 42 U.S.C. § 2000ff-1(b). GIPA requires employers to "treat genetic testing and genetic information in such a manner that is consistent with the requirements of federal law, including but not limited to the Genetic Information Nondiscrimination Act of 2008." 410 ILCS 513/25(a). The Genetic Information Nondiscrimination Act, in turn, makes it unlawful "for an employer to request, require, or purchase genetic information with respect to an employee or a family member of an employee except … where an employer inadvertently requests or requires family medical history of the employee or family member of the employee." 42 U.S.C. § 2000ff-1(b). The federal regulations implementing the "acquisition of genetic information" provision of GINA define "request" for genetic information to include "making requests for information about an individual's current health status in a way that is likely to result in a covered entity obtaining genetic information." 29 C.F.R § 1635.8(a). The regulations also provide that when an employer requires a medical examination related to employment, the employer "must tell health care providers not to collect genetic

information, including family medical history, as part of a medical examination intended to determine the ability to perform a job." 29 C.F.R. § 1635.8(d).

AbbVie argues that GIPA's only reference to GINA "is to its data privacy requirement on how a company must maintain genetic information already in its possession." [100] at 13. But the statute's text makes no reference to genetic information already in an employer's possession, maintenance of genetic information, or data privacy. GIPA requires employers to treat genetic information in a manner consistent with GINA. 410 ILCS 513/25(a). To be consistent with GINA, under GIPA employers must not request genetic information, either purposefully or in a way likely to result in disclosure. *Cf. McKnight v. United Airlines, Inc.*, No. 23-cv-16118, 2024 WL 3426807, at *5 n.1 (N.D. Ill. July 16, 2024) ("GIPA appears to acknowledge the federal 'floor' for genetic information treatment … but goes on to prescribe its own, perhaps more stringent, standards."); *Collins v. NTN Bearing Corp. of Am.*, No. 1:24-CV-6726, 2025 WL 552465, at *3 (N.D. Ill. Feb. 19, 2025) (applying GINA's definition of inadvertent request to GIPA claim because "GIPA incorporates protections from GINA").

It is reasonable to assume that a health care provider would ask about family medical history. *See Collins*, 2025 WL 552465, at *2 n.1 ("This Court tends to agree … that medical history questions are a common feature of physical exams."); 29 C.F.R. § 1635.8(a). To treat genetic information in a manner consistent with federal regulations, employers complying with GIPA must take steps to ensure no genetic

information is requested. Not telling Premise Health to elicit genetic information is not enough; the statute requires an affirmative instruction not to elicit it.

AbbVie hired a health care provider to conduct a medical exam, and it is reasonable to assume that a health care provider would ask about family medical history. AbbVie is responsible for indirectly requesting genetic information from Henry during his physical examination.

AbbVie does not dispute that Section U of the medical surveillance questionnaire includes a request for genetic information. That section includes questions about "children with birth defects," "stillbirths," and "premature birth." [90] ¶ 27. Henry says these questions ask about the "manifestation of a disease or disorder" in a person's child. I assume without deciding that this information constitutes genetic information.

Because (taking disputed facts in his favor) Henry was asked about his family medical history in his physical exam, and the questionnaire included questions about children with birth defects, stillbirths, and premature birth, AbbVie requested genetic information from Henry both orally and in writing.

### B. Inadvertent Disclosure

AbbVie argues that even if it did request genetic information from Henry, any disclosure was inadvertent because the questionnaire included a disclaimer instructing Henry to not provide any genetic information, including family medical history. GIPA includes an exception to liability for requesting genetic information: "inadvertently requesting family medical history by an employer ... does not violate

this Act." 410 ILCS 513/25(g). An inadvertent request makes any acquisition of genetic information lawful. 410 ILCS 513/25(j).

A request is inadvertent if it directs the individual "not to provide genetic information" but still results in genetic information being disclosed in response. 29 C.F.R. § 1635.8(b)(1)(i)(A). In other words, an employer can avoid liability by properly warning an individual to withhold genetic information when responding to a request for medical information. Federal regulations give an example of language that, if used, will deem any receipt of genetic information inadvertent, 29 C.F.R. § 1635.8(b)(1)(i)(B):

> The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

"Alternative language may also be used, as long as individuals and health care providers are informed that genetic information should not be provided." EEOC Final Rule on Title II of the Genetic Information Nondiscrimination Act of 2008, 75 Fed. Reg. 68921 (Nov. 9, 2010).

11

Henry argues that there is a "genuine dispute whether the warning meets the requirements for the inadvertent request defense because the warning did not inform examinees what constitutes protected 'genetic services.'" [89] at 17. He also argues that the language AbbVie inserted about permitting requests for genetic information in "limited circumstances" and its removal of the reference to GINA make the warning insufficient.

The warning on the questionnaire said, [89] at 17:

> AbbVie locations in the U.S. and Puerto Rico are prohibited from asking for genetic information of you or your family member, except in limited circumstances. When responding to any AbbVie requests for medical information, please do not provide any genetic information, including family medical history, the results of genetic tests, information about genetic services, or genetic information of a fetus or an embryo.

Henry testified that he read and understood the questionnaire and its directions. [61-1] at 25 (148:3–8). There is no genuine dispute that this language informed Henry "that genetic information should not be provided." EEOC Final Rule on Title II of the Genetic Information Nondiscrimination Act of 2008, 75 Fed. Reg. 68921. Even in the regulation's sample language, "genetic services" is not defined. And there is no requirement that GINA be referenced; the important language is "that genetic information should not be provided." *Id.* Finally, although the warning did say AbbVie may ask about genetic information "in limited circumstances," the next sentence told those filling the form out to not provide *any* genetic information to AbbVie. The disclaimer on AbbVie's form was enough to make any disclosure on the form inadvertent.

12

On the other hand, the written disclaimer in the form does not necessarily mean that Henry knew that he should not disclose genetic information in response to verbal questions during his physical exam. Even though the request for family medical history was made on the same day that Henry filled out the questionnaire, "it is plausible that [Henry] would view these as separate requests and not associate the warning on the medical questionnaire with the request for" family medical history. *Branson v. Caterpillar, Inc.*, No. 23 CV 14329, 2024 WL 3823157, at *4 (N.D. Ill. Aug. 14, 2024). Because I must take all reasonable inferences in Henry's favor, I find that the disclaimer on the form was not enough to make any verbal request during the physical examination inadvertent as a matter of law.

### C.      Request as a Condition of Employment

Finally, AbbVie argues that the requests for genetic information or family medical history were not a condition of Henry's employment.

Even if the disclaimer would not be enough to make any written disclosure inadvertent, there is no dispute that the request for genetic information on the written questionnaire was not a condition of Henry's employment, for the simple fact that Henry did not fill out that section and it did not affect his employment with AbbVie. There is no dispute that Henry did not fill out the only section arguably seeking genetic information. [90] ¶ 28. There is also no dispute that after his medical surveillance, AbbVie did not change Henry's work assignment or his contractor status. [90] ¶¶ 36–37. No reasonable jury could find that the request for genetic information in Section U was a condition of Henry's employment.

13

Harrington's testimony that Henry could not decline to complete his medical surveillance does not create a genuine dispute over whether the verbal request during his exam was a condition of his employment. The undisputed evidence is that a contractor could decline parts of the surveillance and still have the surveillance considered completed. Leaving a section of the written questionnaire blank did not render Henry's medical surveillance incomplete. It is also undisputed that AbbVie did not know what verbal questions were asked or answered, and did not receive the results or details of the medical surveillance until this litigation. Harrington's testimony, given her role in scheduling, could only reasonably refer to completing the entire medical surveillance process (which could have included declination). A partially incomplete response to verbal questions is consistent with completing the entire medical surveillance process. Henry has not shown otherwise. *See Wade v. Ramos*, 26 F.4th 440, 447 (7th Cir. 2022) (summary judgment is the moment "when a party must show what evidence it has that would convince a trier of fact to accept its version of events"). Because there is no genuine dispute that AbbVie did not condition Henry's employment on a request for genetic information, summary judgment is granted for AbbVie on Henry's claims.

14

## IV.    Conclusion

Defendant's motion for summary judgment, [59], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 20, 2026

15